# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSEPH M. | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18 C 5182 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| ANDREW SAUL, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Joseph M., moves for summary judgment seeking reversal or remand of the final decision of defendant, the Commissioner of Social Security ("Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") (doc. # 17: Pl.'s Summ. J. Mot.; doc. # 18: Pl.'s Summ. J. Mem.). The Commissioner has filed a cross motion for summary judgment asking us to affirm his decision (doc. # 28: Def.'s Summ. J. Mot.; doc. # 29: Def.'s Summ. J. Mem.), and Mr. M. has filed a reply (doc. # 31: Pl.'s Reply). For the following reasons, we deny Mr. M.'s motion, grant the Commissioner's motion, and affirm the Commissioner's decision.

## I.

On November 17, 2014, Mr. M. applied for DIB and SSI, alleging disability beginning on January 21, 2013 due to a meniscus tear in his right knee, high blood pressure, and vision problems (R. 76, 86, 96-97, 124-25, 130, 135, 255). The Social Security Administration ("SSA") denied Mr.

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. https://www.ssa.gov/agency/commissioner.html (last visited Dec. 16, 2019). Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Commissioner Saul as the named defendant.

[2] On September 25, 2018, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 9).

M.'s applications at the initial and reconsideration stages of review, after which Mr. M. requested a hearing before an Administrative Law Judge ("ALJ") (R. 96-97, 124-35, 142-46, 148-49). On July 26, 2017, the ALJ held a hearing at which Mr. M., represented by counsel, and a vocational expert ("VE") testified (R. 39-75). On November 16, 2017, the ALJ issued a decision denying Mr. M.'s DIB and SSI claims (R. 17-38). The Appeals Council denied Mr. M.'s request for review, making the ALJ's decision the final word of the Commissioner (R. 1-5). *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. §§ 404.981, 416.1481.

## II.

Mr. M. was born on November 11, 1954 (R. 204).[3] He obtained his GED in 1979 and served in the National Guard (R. 46-47, 50-51, 256). He has worked as a home healthcare provider, an electrician, and, most recently, a truck driver (R. 257).

It appears that Mr. M. worked steadily (for the most part) as a truck driver from 2007 through January 2013 (R. 52-53, 231-32, 257, 299).[4] On January 21, 2013, Mr. M. suffered a work-related injury to his right knee and stopped working (R. 248, 257; *see* R. 61-62 (testimony from Mr. M. that he originally injured his right knee while working in 2013); R. 486 (May 30, 2015 consultative examination report that Mr. M. "stated that he had right knee joint pain from injury at work about two years ago")). He remained unemployed until May 2014, when he went back to work as a truck driver for a different company (R. 232, 238, 248, 257). Mr. M.'s return to work was short-lived, as he was laid off a month later (R. 238, 241, 248). Mr. M. tried again to work as a truck driver in August 2014, but he was laid off from this job in September 2014 because "he was too slow" and could not keep up (*Id.*). After not working in 2015, Mr. M. worked as a truck

---

[3] At the administrative hearing, Mr. M. testified that he was born a year later, on November 11, 1955 (R. 45).

[4] Mr. M. made at least $22,892.93 per year from 2007 through 2012, except for 2010, when he made less than $8,000 (R. 234). The reason for this significant dip in earnings is unclear from the record.

driver again from early 2016 through September or October of that year, when he stopped working for good (*see* R. 45-47, 54-55, 221, 233-34).

## A.

Mr. M. asserts that his conditions (right-knee meniscus tear, high blood pressure, and vision problems) became severe enough to keep him from working on January 21, 2013 (R. 255). On that date, which is also the date Mr. M. suffered his work-related right-knee injury, Mr. M. had an x-ray taken of his right knee (R. 248, 364). The x-ray indicated mild degenerative change and no fracture or effusion (R. 364). The following month, an MRI showed a meniscus tear, fissuring of cartilage, and mild edema in a knee fat pad (R. 363).

In September 2013, Mr. M. presented to Titilayo Abiona, M.D., complaining of headaches and dizziness (R. 426, 435-36). He reported occasional chest tightness, although he was not experiencing any at the time of the visit (R. 436). Dr. Albiona requested a cardiac stress test, which Mr. M. underwent in November 2013 (R. 453-54). During the stress test, Mr. M. experienced no chest pain, but the test had to be stopped due to Mr. M.'s fatigue (R. 454). The impressions from the stress test were a normal stress EKG, negative for ischemia; hypertensive blood pressure response to exercise; and below-average exercise capacity for age (*Id.*).

In December 2013, Mr. M. presented to Lorena Monterubianesi, M.D., to establish a primary care physician relationship (R. 455-56; *see also* R. 498 (July 2015 note reporting that Mr. M. identified Dr. Monterubianesi as his primary physician)). A review of Mr. M.'s musculoskeletal system was negative, but he was diagnosed with uncontrolled hypertension (R. 456, 458). At the time, Mr. M. was taking two medications, metoprolol tartrate and amlodipine, which are used to

treat hypertension (R. 457).[5] Dr. Monterubianesi reinforced the need for Mr. M. to maintain a low sodium diet and to take his medications (R. 458).

Mr. M. followed up with Dr. Monterubianesi in June 2014 (R. 459-63). Mr. M.'s musculoskeletal system review was once again negative (R. 460). Dr. Monterubianesi noted that Mr. M. had been out of his medications for the past two weeks, and she reinforced her advice about medication compliance (R. 460, 462).

After undergoing some diagnostic tests in December 2014 (R. 467-74), Mr. M. followed up with Dr. Monterubianesi again in January 2015 (R. 475-76). Although Mr. M. had a lump on his right wrist, a review of Mr. M.'s musculoskeletal system was otherwise negative (R. 476, 478). In addition to noting Mr. M.'s hypertension and wrist lump, Dr. Monterubianesi noted that Mr. M. had experienced two episodes of vasovagal syncope in 2014 (R. 479).[6] Mr. M. showed up without taking his medications and, like his last visit, he had run out of his medications two weeks before (R. 476, 479). Dr. Monterubianesi changed Mr. M.'s blood pressure medications to losartan and hydrochlorothiazide and advised Mr. M. to take his medications and return the next week (R. 479).

On January 11, 2015, Mr. M. was admitted to the emergency room after he became dizzy and lightheaded and passed out for a couple seconds (R. 259, 373, 376-77). Mr. M. reported that this had happened in the past, but he did not report any concerning symptoms (R. 381). Mr. M. also denied joint pain and, upon physical examination, exhibited good range of motion in his musculoskeletal system (R. 379). The emergency room records note that after being admitted, Mr.

---

[5] *See* Metoprolol Tartrate Uses, Side Effects & Warnings, Drugs.com, https://www.drugs.com/mtm/metoprolol-tartrate.html (last visited Dec. 16, 2019); Amlodipine: Drug Uses, Side Effects & Dosage, Drugs.com, https://www.drugs.com/amlodipine.html (last visited Dec. 16, 2019).

[6] A vasovagal syncope occurs when one faints because his or her "body overreacts to certain triggers, such as the sight of blood or extreme emotional distress." Vasovagal syncope – Symptoms and causes, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-20350527 (last visited Dec. 16, 2019).

M. was "continuously ambulating the hallways and even went outside to make a phone call," where he was pacing while talking on his cell phone (R. 376, 381). Mr. M. was discharged a few hours after his admission to the emergency room (R. 373, 381).

Mr. M. followed up with Dr. Monterubianesi in March 2015 and, again, in April 2015 (R. 591-98). At the March visit, Mr. M. had been out of his medications for two weeks and had stopped taking losartan and hydrochlorothiazide due to his belief that these medications caused his past syncope episodes (R. 593, 595, 597). Instead, he was taking clonidine, another medication for hypertension, for which Dr. Monterubianesi upped the dosage (R. 597).[7] Dr. Monterubianesi reinforced medication compliance; nevertheless, Mr. M. showed up for his April visit again being out of medications for two weeks (R. 591, 597). Dr. Monterubianesi again reinforced medication compliance (R. 593). Other than the lump on his right wrist, review of Mr. M.'s musculoskeletal system was negative at each visit (R. 591, 593, 595, 597).

On May 30, 2015, Mr. M. presented to Albert Osei, M.D., for an internal medicine consultative examination (R. 486-94). Dr. Osei identified Mr. M.'s chief complaints (*i.e.*, what allegedly caused Mr. M.'s disability) as knee pain and hypertension (R. 486). Mr. M. told Dr. Osei "that he had right knee joint pain from [an] injury at work about two years ago," that he experienced pain daily, and that, for the past two years, he had used a cane that was given to him when he had his right knee x-rayed in January 2013 (*Id.*).[8] According to Mr. M., he had also undergone a few sessions of physical therapy and surgery had been recommended; however, surgery "was not done because the company went into bankruptcy" (*Id.*). Mr. M. also told Dr. Osei that he could only

---

[7] *See* Clonidine: Drug Uses, Dosage, & Side Effects, https://www.drugs.com/clonidine.html (last visited Dec. 16, 2019).

[8] Mr. M. told Dr. Osei that the cane was given to him "by a physician at Ingalls emergency room" (R. 486). Mr. M. had his January 21, 2013 right-knee x-ray taken at Ingalls Memorial Hospital (R. 364).

walk "one half blocks," stand for 20 minutes, and sit for one hour (*Id.*). Mr. M. further reported that his hypertension had been controlled for the most part with clonidine, which he was currently taking, and that he did not experience syncope episodes on standing while taking clonidine, whereas he did with other antihypertensive medications he previously took (R. 486-87).

Upon physical examination, Dr. Osei noted that Mr. M. could get on and off the examination table and get up from a seated position with no difficulty (R. 488). Range of motion was normal in Mr. M.'s spine, although it was reduced in his right knee joint due to pain (R. 489). Mr. M. could walk more than 50 feet using a cane; without the cane, he could still walk more than 50 feet, but he did so at a slow to moderate pace and with a limp (*Id.*). Mr. M. could perform toe/heel/tandem walk with moderate difficulty, could only partially squat because of right-knee pain, and was able to stand on either leg unsupported, although he could not hop on either leg (*Id.*). Dr. Osei's impressions were a right knee injury and pain, with an MRI finding of a torn meniscus; uncontrolled hypertension; and obesity (R. 490).

In June 2015, non-examining state agency consultant Prasad Kareti, M.D., reviewed Mr. M.'s medical evidence, including Dr. Osei's examination, at the initial stage of SSA review (R. 76-97). Dr. Kareti opined that Mr. M. could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; and occasionally kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds (R. 81-83, 91-93). Dr. Kareti also opined that although Mr. M. had severe loss of central visual acuity, he did not experience any corresponding visual limitations (R. 80, 83, 90-91, 93).

On July 1, 2015, Mr. M. went to the emergency room complaining of chest pain (R. 317, 495-96, 498). He denied any muscle pain and, upon examination, did not exhibit any back tenderness (R. 500). Mr. M. also admitted that he had missed a few doses of clonidine, and he was

6

educated for medication compliance (R. 504, 508). Mr. M. was admitted overnight and discharged the next day (R. 495, 497). Two weeks later, Mr. M. saw Pankaj Jain, M.D., at Pulmonary and Sleep Associates for assessment of a lung nodule that had been shown by imaging during Mr. M.'s July 1-2 emergency room stay (R. 496, 501-02, 504, 548-50). Dr. Jain identified "back ache" as one of Mr. M.'s ongoing medical problems (R. 550).

On August 10, 2015, Mr. M. presented to Dr. Monterubianesi for a follow-up visit (R. 587-90). Mr. M. had been out of his hypertension medication (clonidine) for the past two weeks, and Dr. Monterubianesi, once again, reinforced medication compliance (R. 587, 589). At this visit, Mr. M. complained of intermittent lower back pain on his right side that had begun two years ago and which he rated as an eight out of ten for pain (R. 587 ("today c.o lbp off and on, started 2 years ago, no radiated, it is on the right side, 8/10")). He also complained of right-knee pain and requested a knee brace (*Id.*). Dr. Monterubianesi's review of Mr. M.'s musculoskeletal system noted bilateral knee crepitus, lower back pain, and muscles tender to palpation (R. 589). Dr. Monterubianesi diagnosed Mr. M. with chronic lower back pain and, presumably referring to Mr. M.'s right knee, joint pain (*Id.*).

The same day, Mr. M. underwent a series of x-rays for his reports of back and right knee pain (R. 571-76, 589). The knee x-ray showed mild degenerative joint disease ("DJD") in the medial compartment of the right knee (R. 571). The x-rays of Mr. M.'s spine showed a normal thoracic spine but DJD of the facet joints and mild degenerative disc disease ("DDD") in the lumbosacral region (R. 573, 575).

Mr. M. saw Dr. Jain again in September 2015 (R. 554-56). Dr. Jain again identified "back ache" as one of Mr. M.'s ongoing medical problems (R. 556). The following month, Mr. M. returned to see Dr. Monterubianesi (R. 582-86). At this October 2015 follow-up visit, Mr. M. still

complained of intermittent right-side lower back pain (R. 582). As was the case at Mr. M.'s last visit (in August 2015), Dr. Monterubianesi's review of Mr. M.'s musculoskeletal system noted bilateral knee crepitus, lower back pain, and muscles tender to palpation (R. 584). Dr. Monterubianesi also repeated her diagnosis of chronic lower back pain and joint pain and she listed, for the first time, chronic lower back pain as a problem (*compare* R. 583-85, *with* R. 588-89). Furthermore, Dr. Monterubianesi noted that Mr. M. could walk up to three blocks and that he walks with a cane (R. 582, 584). The notes from this visit indicate that Dr. Monterubianesi intended to or did refer Mr. M. to physical therapy for his lower back pain (R. 584). Dr. Monterubianesi prescribed Mr. M. tramadol (a pain reliever) and also increased the dosage of Mr. M.'s clonidine prescription (R. 584-85).

On November 5, 2015, Mr. M. underwent a CT scan of his lumber spine (R. 579-80). The scan showed moderately severe to severe DJD of the facet joints throughout the lumbar spine with disc bulging at various levels, but no foraminal narrowing (R. 579).

The same month, non-examining state agency consultants Jerda Riley, M.D., and Anne Prosperi, D.O., evaluated Mr. M.'s medical evidence at the reconsideration stage of SSA review (R. 98-125). Dr. Riley evaluated the evidence regarding Mr. M.'s visual abilities and determined that Mr. M.'s loss of central visual acuity was not severe (R. 104-05, 117-18). Dr. Prosperi evaluated the evidence regarding Mr. M.'s other physical abilities and came to the same conclusion about Mr. M.'s functional limitations as the consultant who reviewed Mr. M.'s evidence at the initial stage of SSA review, Dr. Kareti (*compare* R. 106-08, 119-21, *with* R. 81-83, 91-93).

In January 2016, Mr. M. visited the emergency room after hurting his wrist while climbing into a truck (R. 608-09). Review of his musculoskeletal system was positive for arthralgias, but, upon physical examination, Mr. M. moved all extremities equally and had full range of motion in

all extremities (R. 611-12). It was also noted that, upon discharge, Mr. M. ambulated with a slow, steady gait (R. 610).

A little more than six months later, in July 2016, Mr. M. was at the emergency room again, this time with chest pain (R. 618-20). The attending physician noted that Mr. M. had run out of his blood pressure medication (clonidine) two weeks before (R. 620, 628, 630). Mr. M. denied back pain, and he was noted to have "[g]ood range of motion in all major joints" with "[n]o tenderness to palpation . . . noted" (R. 621-22). According to the emergency room records, the discharging physician suspected that his symptoms were related to uncontrolled hypertension (R. 628). It was further noted that Mr. M. was only taking clonidine daily, which is not appropriate, and that his poor compliance also made clonidine more difficult to use (*Id.*).[9] As a result, Mr. M.'s blood pressure medication was changed from clonidine to Procardia (*Id.*).

Mr. M. saw Dr. Monterubianesi again in March 2017 (R. 659-65). The visit record noted that Mr. M. complained of right knee pain and said that his knee "sometimes gives [out] when [he] tries to walk" (R. 661). Upon examination, Mr. M. exhibited right knee crepitus with a mild decreased extension, and he was diagnosed with chronic knee pain (R. 663-64). Although chronic lower back pain was also diagnosed, Mr. M.'s musculoskeletal review was negative and he exhibited normal range of motion and no tenderness upon examination outside of his right knee (R. 661, 663-64). Dr. Monterubianesi further noted that Mr. M. had missed physical therapy in the past and that he was walking unassisted, although he would need a cane for stability (R. 665). Mr. M.'s hypertension was also uncontrolled, and he reported that he had no blood pressure medications other than clonidine, and that he had run out months ago (R. 661, 664). Dr. Monterubianesi continued Mr. M. on clonidine and had him resume taking losartan and

---

[9] As of October 2015, Mr. M. was supposed to be taking 0.3 mg of clonidine "bid," *i.e.*, twice per day (*see* R. 582-84).

hydrochlorothiazide (R. 664). Dr. Monterubianesi also had Mr. M. continue to take tramadol (R. 661, 665).

Less than a month later, on April 5, 2017, Mr. M. was admitted to the emergency room after experiencing two short-lived episodes of chest pain (R. 670-73). He reported that he was compliant with his medications, which included Cozaar (a brand name for losartan) and Procardia, although his discharge summary noted that "[i]t is not clear that he has been taking" his hypertension medications (R. 673, 680). The discharge summary also noted Mr. M.'s report that "[h]e has not taken some medicines in the past because of the 'side effects'" (R. 680). Review of his musculoskeletal system was negative for back pain, joint pain, or muscle pain and showed normal range of motion (R. 673, 675, 686-87). When Mr. M. went to the bathroom the night of his admission, his gait was observed to be steady, and the notes do not refer to any use of a cane by Mr. M. (R. 679). Mr. M. was discharged two days after he was admitted (R. 670).

## B.

As already noted, the ALJ held a hearing where Mr. M., represented by counsel, testified. When the ALJ asked Mr. M. why he stopped driving trucks in 2016, Mr. M. replied that back pain and fainting episodes (preceded by overheating) prevented him from working (R. 54-55). Mr. M. testified that his back pain is about an eight or nine out of ten (R. 55-56). He was not prescribed physical therapy for his back, but he was prescribed pain medication (R. 55-57). The pain medication sometimes helped to reduce his back pain to about a five out of ten, although Mr. M. indicated that he took three or four more pills than prescribed to achieve this level of relief (*Id.*). When asked whether this pain medication caused any side effects, Mr. M. testified that he did not know (*Id.*). Mr. M. was also prescribed a back brace, but the brace "somehow [went] missing" (R. 57). Mr. M. further testified that he did not know the cause of his overheating and fainting episodes,

but that his doctors told him they resulted from Mr. M. eating at truck stops and getting food poisoning (R. 57-58).

Upon questioning from his attorney, Mr. M. also identified his right knee as a source of pain (R. 61-62). The pain comes "[e]very now and then" and can reach the level of a seven or eight out of ten (R. 63). He was prescribed medication that sometimes helps to alleviate his knee pain (R. 63-64). Mr. M. is supposed to take the medication once every time he needs it, but sometimes he takes the medication twice because of the pain, even though he does not "like taking too many pills" (R. 63). His knee also sometimes "gives out" when he tries to walk (R. 62). Mr. M. testified that he was prescribed physical therapy and given a cane when he hurt his right knee in January 2013 (R. 57, 61-62, 218, 248). Mr. M. had a cane with him at the hearing and testified that he had been using it ever since it was given to him (R. 61).

Mr. M. testified that he can stand for, at most, 30 minutes, and he sometimes has difficulty sitting (R. 61). During the day, he walks around for a little bit, and then he will sit down for a while (R. 58). He has trouble showering and getting dressed (R. 58-59). He does not clean, do laundry, or work outside (R. 59). If Mr. M. goes grocery shopping, he goes with someone (*Id.*). Mr. M. is sometimes compliant with taking all his medications (and sometimes not), and he indicated that he sometimes overmedicates (R. 56-58, 63).

A VE also testified at the hearing. The VE testified that an individual who could perform medium work; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, or scaffolds; and occasionally work at unprotected heights and around moving mechanical parts could perform Mr. M.'s past work as a truck driver "per the DOT

11

and as typically performed" (R. 66-67).[10] The VE further testified that an individual with these capabilities could perform work as a packager, order picker, or machine feeder (R. 67-68).

## III.

In denying Mr. M.'s claims, the ALJ followed the familiar five-step process for assessing disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). As an initial matter, the ALJ determined that Mr. M.'s date last insured was September 30, 2020 (R. 22). Then, at Step One, the ALJ determined that Mr. M. had not engaged in substantial gainful activity since his alleged disability onset date, January 21, 2013 (R. 22-23).[11] At Step Two, the ALJ determined that Mr. M. suffered from the following severe impairments: osteoarthritis, degenerative disc disease in the lumbar spine, obesity, and hypertension with chest pain (R. 23). At Step Three, the ALJ determined that none of Mr. M.'s impairments, individually or in combination, met or equaled a listed impairment (*Id.*).

Between Steps Three and Four, the ALJ evaluated Mr. M.'s residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ concluded that Mr. M. retains the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except that he can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, and scaffolds; and occasionally work at unprotected heights and around moving mechanical parts (R. 23-24).[12] At Step Four, the ALJ found that Mr. M. could

---

[10] "DOT" stands for the Dictionary of Occupational Titles, which is a source VEs typically rely upon in giving vocational testimony. *Lisa Ann B. v. Berryhill*, No. 17 cv 9089, 2019 WL 1505914, at *2 (N.D. Ill. Apr. 5, 2019).

[11] The ALJ noted that Mr. M. had worked after the alleged disability onset date and had earnings in 2016 exceeding substantial gainful activity levels, but she stated that she was giving Mr. M. "the benefit of the doubt" in proceeding to Step Two (R. 22-23).

[12] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). The ability to perform the full range of medium work also requires the ability to stand or walk, "off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

perform his past relevant work as a truck driver (R. 31-32). The ALJ also proceeded to Step Five and found, in the alternative, that Mr. M. could perform other jobs that exist in substantial numbers in the national economy, such as packager, order picker, and machine feeder (R. 32-33). Thus, the ALJ concluded that Mr. M. was not disabled (R. 33).

## IV.

Courts review ALJ decisions deferentially to determine if they apply the correct legal standard and are supported by "substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (internal citations and quotations omitted). To satisfy the "substantial evidence" standard, "the ALJ must build an accurate and logical bridge from the evidence to her conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (internal citations and quotations omitted). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the [ALJ] by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018).

Mr. M. argues that the ALJ reversibly erred by (1) improperly evaluating his subjective symptom allegations; (2) failing to account for all his limitations in combination when assessing his RFC; (3) rejecting the function report submitted by Mr. M.'s sister; (4) relying solely upon the opinions of non-examining state agency consultants; (5) finding that Mr. M. was capable of performing his past relevant work as a truck driver; and (6) accepting and relying upon the VE's testimony (Pl.'s Summ. J. Mem. at 6-13). Because Mr. M. has not shown that the ALJ committed any reversible errors, we affirm the ALJ's decision.

**A.**

We start with Mr. M.'s challenge to the ALJ's assessment of his alleged symptoms. SSR 16-3p defines "a symptom as the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). An ALJ must "evaluate the intensity and persistence of an individual's symptoms" so she can determine how those symptoms limit the individual's "ability to perform work-related activities." *Id.* We will overturn this evaluation, which we refer to as the ALJ's subjective symptom assessment, only if it "is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Because the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness," this standard is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The claimant bears the burden of demonstrating that an ALJ's subjective symptom assessment is "patently wrong." *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018); *Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 884 (N.D. Ill. 2019).

Here, the ALJ concluded that Mr. M.'s "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record" (R. 29-30). Mr. M. challenges this adverse subjective symptom assessment on several grounds. None of these grounds persuades us that the ALJ's assessment was patently wrong.

**1.**

Mr. M. first asserts that the omission of the word "credibility" from SSR 16-3p was intended to prevent "gratuitous attacks on a [claimant's] truthfulness" and that, contrary to this intention, the ALJ improperly focused on Mr. M.'s "capacity for truthfulness" (Pl.'s Summ. J.

Mem. at 7-8).[13] According to Mr. M., the ALJ's skepticism about his reported symptoms "was obvious from the outset," as "[s]he prefaced every statement with some expression of doubt—'he is *allegedly* unable,' 'he *allegedly* uses a cane,' 'his knee *reportedly* gives out'" (*Id.* at 8) (emphases added). Moreover, Mr. M. continues, the ALJ offered no basis for asserting that Mr. M.'s testimony was "notably vague" at the hearing (*Id.*). Mr. M. claims that instead of taking steps to clarify his testimony, the ALJ "seemed to just brand him as untruthful" (*Id.*).

These assertions are baseless. The Seventh Circuit has made clear that the SSA's elimination of the word "credibility" from SSR 16-3p did not change the fact that ALJs must still assess the credibility of a claimant's assertions regarding his symptoms:

> The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.

*Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). By reciting what Mr. M. "allegedly" or "reportedly" could do or experienced, the ALJ did not reveal a "propensity to disbelieve [his] allegations" (Pl.'s Summ. J. Mem. at 7). Rather, the ALJ merely recognized that Mr. M.'s allegations about his symptoms were just that—allegations—unless she decided to accept them as true, which she was under no preordained obligation to do. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) ("Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the

---

[13] For all ALJ decisions made on or after March 28, 2016, SSR 16-3p supersedes SSR 96-7p, which referred to assessing the "credibility" of an individual's statements about his symptoms. *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462-03, 2017 WL 4790249, at *49468 n.27 (Oct. 25, 2017); SSR 16-3p, 2016 WL 1119029, at *1; SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). The ALJ issued her decision on November 16, 2017 (R. 33), so SSR 16-3p governed her subjective symptom assessment. *See* 82 Fed. Reg. 49462-03 at *49468 n.27.

basis of the other evidence in the case"); *Fuchs v. Astrue*, 873 F. Supp. 2d 959, 974 (N.D. Ill. 2012) ("[A]n ALJ is never required to accept a claimant's testimony as true").

As for the ALJ's statement that Mr. M.'s hearing testimony was "notably vague when describing [a] work attempt and his symptoms" (R. 25), this was an assessment of Mr. M.'s testimony that the ALJ (who was present at the hearing) was permitted to make in evaluating Mr. M.'s allegations. *See Powers*, 207 F.3d at 435 ("[H]earing officers are in the best position to see and hear the witnesses and assess their forthrightness"); *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989) (noting that an ALJ can "consider his own observations with respect to the claimant's demeanor and credibility at the administrative hearing in reaching his decision"). The administrative hearing is the claimant's chance to tell an ALJ, in his own words, why he believes he is disabled. An ALJ generally is entitled to discount the allegations of a claimant who cannot make his case for disability with some specificity, especially where, as here, Mr. M. was represented by counsel during the hearing. *See Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits").

Mr. M. disputes the ALJ's characterization of his testimony as vague, arguing that he was instead "confused and unable to recall specific dates or weights of items lifted at work" (Pl.'s Summ. J. Mem. at 8). We believe the ALJ's characterization of Mr. M.'s testimony is supported by the hearing transcript. But even if we accepted Mr. M.'s preferred characterization, it would not be any better for his case, as confusion and a lack of memory do not help Mr. M. prove his disability claim. Nor do we see why an ALJ cannot consider a claimant's inability to answer questions about employment or treatment even though the ALJ can confirm the relevant

information from the documentary record (*see id.*). If it was necessary, as Mr. M. now contends, for questions directing him to "a tangible and familiar frame of reference for estimating how much weight he lifted at work" (*id.*), his attorney at the hearing could have asked these questions. Indeed, because Mr. M. was represented by an attorney at the hearing, the ALJ could assume that, by his testimony, Mr. M. was "making his strongest case for benefits." *See Glenn*, 814 F.2d at 391.

**2.**

Mr. M. next contends that by discounting his allegations on the bases of "conservative treatment" and supposedly minimal findings, "the ALJ cherry picked benign objective evidence from a four[-]month period and occasional notations of 'no visible distress' regarding one or another impairment" (Pl.'s Summ. J. Mem. at 8 (citing R. 26)). Mr. M., however, mischaracterizes the ALJ's decision; the ALJ pointed out that medical findings and pain reports related to Mr. M.'s alleged knee and back pain were lacking for more than a year (December 2013 to April 2015), not just four months (R. 25-26).

Moreover, an ALJ only "cherry picks" evidence when she turns a blind eye to facts that support the claimant's disability claim. *See, e.g., Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ . . . cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding"). And here, Mr. M. does not point to any favorable evidence that the ALJ ignored. Although Mr. M. recites various pieces of evidence that purportedly support his pain allegations—his February 2013 right knee MRI, the August 2015 imaging of his right knee and spine, his observed bilateral knee crepitus and use of a cane, and his November 2015 spinal CT (Pl.'s Summ. J. Mem. at 9)—the ALJ discussed most of this evidence (*see* R. 25 (discussing early 2013 right-knee MRI); R. 26 (discussing Mr. M.'s bilateral knee crepitus and observed use of a cane); R. 27 (discussing August 2015 imaging)). True, the ALJ did

not explicitly summarize the November 2015 CT like she did with the other aforementioned evidence. But the ALJ recognized that the imaging and treatment notes in the record indicated that Mr. M. had "persistent knee pain and lower back pain attributable to moderate to severe degenerative changes" (R. 25), which is what the November 2015 CT showed (*see* R. 579). In any event, the ALJ was not required to "discuss every piece of evidence in the record." *Green v. Saul*, 781 F. App'x 522, 528 (7th Cir. 2019); *see Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) ("[T]he ALJ need not evaluate in writing every piece of testimony and evidence submitted").

### 3.

Citing *Hall v. Colvin*, 778 F.3d 688 (7th Cir. 2015), Mr. M. also asserts that this is a "pain case" that "renders much of the ALJ's assessment flawed" (Pl.'s Summ. J. Mem. at 8; Pl.'s Reply at 1-2). By "pain case," it appears that Mr. M. means that the ALJ impermissibly required objective proof of his pain before he would credit it (*see* Pl.'s Reply at 2).

An ALJ cannot disregard a claimant's pain allegations "solely because they are not substantiated by objective medical evidence." *Hall*, 778 F.3d at 691 (internal quotations omitted). But that is not what the ALJ did here. To the contrary, the ALJ recognized that the medical evidence indicated "persistent knee pain and lower back pain attributable to moderate to severe degenerative changes" (R. 25). It was just that other factors, such as Mr. M.'s sporadic complaints and minimal treatment (*see id.*), led her to find that notwithstanding his reports of pain, Mr. M. was more capable than he claimed.

### 4.

Mr. M. also contends that the fact that he "can bathe and dress independently does not translate into an ability to sustain full time work, and the ALJ failed to connect the dots" (Pl.'s Summ. J. Mem. at 9). Although a person who can bathe and dress independently may not

necessarily be able to work full-time, Mr. M. does not identify any aspect of the ALJ's decision where she improperly equated Mr. M.'s ability to bathe and dress with the ability to work full time.

**5.**

Mr. M.'s arguments fail to demonstrate that the ALJ's subjective symptom assessment is "patently wrong." Moreover, our own review of the ALJ's decision confirms that the ALJ's subjective symptom assessment is supported by enough valid reasons to require the Court to uphold it. *See Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons [for discounting a claimant's allegations] must be valid as long as *enough* of them are") (emphasis in original); *see also Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008) (upholding a subjective symptom assessment that was supported by a single valid reason); *Kittelson v. Astrue*, 362 F. App'x 553, 557-58 (7th Cir. 2010) (same).

The ALJ discounted Mr. M.'s allegations because the record evidence indicated that he had not undergone "a sustained period of treatment compliance regarding his hypertension or his musculoskeletal impairments since his alleged onset date, which suggests that his daily symptoms are not as limiting as he alleged" (R. 31; *see also* R. 25 (characterizing Mr. M.'s treatment for his knee and back pain as minimal)). "[I]nfrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment," such as an inability to afford treatment. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Here, the ALJ did not err in relying upon Mr. M.'s treatment record to discount Mr. M.'s claims concerning his limitations.

Mr. M.'s attorney conceded at the administrative hearing that Mr. M. did not obtain consistent treatment for his back (R. 74 ("There really isn't any consistent treatment for the back")). Mr. M. testified that although he was prescribed a back brace, it somehow went missing

(R. 30, 57), and there is no evidence that he ever attempted to get another brace. The ALJ also noted that although Mr. M. reported in August 2015 that he had been experiencing back pain on and off for the past two years, Mr. M. had not complained to his doctors about this alleged pain beforehand (R. 25-26, 587). Similarly, the record contained no reports of knee pain or physical examination findings that would indicate knee pain between January 2013, when Mr. M. injured his knee and said he became disabled, and May 2015, when Mr. M. stated at a consultative examination that he experienced daily knee pain—a period of almost two-and-a-half years (R. 25-26, 30). Mr. M. does not contend that the absence of care or treatment for his musculoskeletal pain was due to a lack of insurance or for some other good reason, so the ALJ could properly conclude that this treatment record was inconsistent with Mr. M.'s allegations of disabling knee and back pain.

The ALJ likewise permissibly relied upon Mr. M.'s non-compliance with his hypertension medication. *See Craft*, 539 F.3d at 679; *Brenda L. v. Saul*, 392 F. Supp. 3d 858, 870 (N.D. Ill. 2019) ("The ALJ may deem an individual's statements less credible if medical reports or records show that the individual is not following the treatment as prescribed"). As the ALJ pointed out, Mr. M. "had not been compliant with his recommended blood pressure medications at any point throughout the treatment record" (R. 30). Despite being repeatedly advised about the need to take his hypertension medication, Mr. M. showed up for doctor visits and at the emergency room time and time again after being out of medication for two weeks (*e.g.*, R. 27-30, 458, 460, 462, 476, 479, 587, 589, 591, 593, 595, 597, 620; *see also* R. 680 (April 2017 emergency room record indicating that "[i]t is not clear that [Mr. M.] has been taking" his hypertension medications)). Although Mr. M. later asserted in his function reports that clonidine makes him sleepy (*see, e.g.*, R. 293, 329), he does not argue that this was the reason for his non-compliance. Nor did Mr. M.

report to Dr. Monterubianesi, his primary care physician, that his medication non-compliance stemmed from a desire to avoid sleepiness or other side effects.[14] Absent a good reason for Mr. M.'s medication non-compliance, which we do not see in the record, the ALJ could use it to discount his allegations.

The ALJ also discounted Mr. M.'s allegations about his reported need to use a cane because they were inconsistent with the treatment record (R. 30). In evaluating a claimant's allegations, an ALJ may rely upon inconsistencies between the allegations and the treatment record. *See* SSR 16-3p, 2016 WL 1119029, at *7 (noting that if a claimant's symptom allegations "are inconsistent with the objective medical evidence and the other evidence," the ALJ will find that the claimant's "symptoms are less likely to reduce his" ability to work). The ALJ noted that Mr. M. was observed with a cane only twice in connection with his many medical visits during the relevant time period; otherwise, he was "observed as having steady gait without the use of a cane for ambulation" (R. 30). Moreover, the ALJ noted that Mr. M. did not report knee pain to his treating physicians from September 2013 through August 2015 (*Id.*). It was reasonable for the ALJ to conclude that Mr. M. would have reported knee pain and been observed using a cane more often if he truly needed to use a cane as much as he claimed. *See Joe R.*, 363 F. Supp. 3d at 884 (finding that common sense and human experience dictated that a claimant would have mentioned something about his limited ability to stand or walk at clinic visits over the years if he was so limited).

Finally, the ALJ found it notable that Mr. M.'s testimony about his symptoms and work history was vague (R. 25). As we already touched on, we do not see why an ALJ cannot take into

---

[14] During his April 2017 visit to the emergency room, Mr. M. reported that he had "not taken some medicines in the past because of the 'side effects'" (R. 680), but this appears to be the only time he made such a report to a doctor.

account, as part of her observation of a claimant's testimony, the claimant's inability to clearly explain his alleged disabilities and other relevant aspects of his case.

In the end, our review of the ALJ's subjective symptom assessment is "extremely deferential." *Bates*, 736 F.3d at 1098. This deference is exemplified in *Bates*, where the Seventh Circuit upheld an adverse subjective symptom assessment based on a minor discrepancy—the claimant testified that she did no household chores, whereas she previously reported that she did some cooking—coupled with the ALJ's observation that the claimant did not overtly show pain at the hearing. *Id.* The ALJ's subjective symptom assessment here is similarly supported by her observation and assessment of Mr. M.'s hearing testimony and inconsistencies in the record. Given the deferential standard of review, we do not find that the ALJ's subjective symptom assessment is "patently wrong."

## B.

Mr. M. next contends that the ALJ failed to account for all of his limitations in combination when she rendered her RFC assessment (Pl.'s Summ. J. Mem. at 10-11). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675-76. "It is based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family." *Id.* at 676. "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton*, 596 F.3d at 423. Even so, an ALJ need only include RFC restrictions that are "supported by the medical evidence and that the ALJ found to be credible." *Outlaw v. Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011).

Here, the ALJ concluded that Mr. M. retains the RFC to perform medium work except that he can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; occasionally

climb ladders, ropes, and scaffolds; and occasionally work at unprotected heights and around moving mechanical parts (R. 23-24). The RFC's "medium" work restriction means that Mr. M. can lift no more than 50 pounds at a time, can frequently lift or carry objects weighing up to 25 pounds, and can stand or walk, "off and on, for a total of approximately 6 hours of an 8-hour workday." 20 C.F.R. §§ 404.1567(c), 416.967(c); SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). Mr. M. contends that this RFC "simply makes no sense" and "is utterly inconsistent with [his] combined limitations" (Pl.'s Summ. J. Mem. at 10-11). We disagree.

## 1.

Mr. M. first faults the ALJ for not imposing an RFC restriction that requires him to use a cane (Pl.'s Summ. J. Mem. at 10-11). According to Mr. M., the ALJ "simply decided to pretend [Mr. M.'s] cane never existed" (*Id.* at 10).

The ALJ did no such thing. She noted both Mr. M.'s report of using a cane because of right knee instability and Mr. M.'s testimony that he was prescribed a cane in 2013 for his right knee instability and pain (R. 24-25). The ALJ also recognized instances in the record where a doctor observed Mr. M. with a cane or noted his reported cane use (R. 26 (discussing May 30, 2015 consultative examination where Mr. M. reported using a cane and October 19, 2015 office visit where Mr. M. "appeared to be walking with a cane"); *see* R. 486, 584).

Ultimately, though, the ALJ found that Mr. M.'s "reported need to use a cane" was "inconsistent with the treatment record" (R. 30). In the ALJ's view—which Mr. M. does not address, let alone dispute—the instances where Mr. M. used a cane during his treatment period were the exception; he otherwise was observed to have a "steady gait without the use of a cane for ambulation" (*Id.*). The ALJ also noted the lack of treatment and reports of pain that one might expect to accompany the need to use a cane (*Id.* ("[T]he claimant has not pursued any continuous

23

treatment for his right knee pain. . . . [T]he claimant has only reported knee pain and lower back pain on a sporadic basis; the claimant did not report any musculoskeletal pain or dysfunction to his treating physicians from September 2013 through August 2015")). It was reasonable for the ALJ to conclude that if Mr. M. *needed* to use a cane, he would have more consistently reported knee pain and his use of the cane would have been noted more than a couple times over a several-year treatment span, which, as the ALJ found, was not the case (R. 26, 30). *See Joe R.*, 363 F. Supp. 3d at 884. That an individual may use a cane does not necessarily warrant a corresponding RFC restriction. Rather, to justify a cane RFC restriction, the individual must show that a cane is a medical necessity and under which circumstances the cane is medically necessary. *See Petelle v. Berryhill*, No. 16 C 4208, 2017 WL 1208442, at *6 (N.D. Ill. Apr. 3, 2017). Because Mr. M. has not done so, the ALJ's decision not to include a cane RFC restriction was not erroneous.[15]

## 2.

Mr. M. also contends that the ALJ did not consider his obesity in assessing his RFC (Pl.'s Summ. J. Mem. at 10-11).[16] Not so. After concluding that Mr. M.'s obesity was a severe impairment having "more than a minimal effect on [his] ability to perform basic work activities," the ALJ stated that she "considered SSR 02-1p when evaluating [Mr. M.'s] obesity as a severe

---

[15] We recognize that Dr. Monterubianesi stated in March 2017 that Mr. M. "would need a cane for" stability (R. 665), but Mr. M. does not argue that this statement shows that a cane is a medical necessity (Pl.'s Summ. J. Mem. at 10-11). *See Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, 733 F.3d 700, 703 (7th Cir. 2013) ("[A]n argument . . . not raised before the district court is forfeited"). Moreover, it is not clear that Dr. Monterubianesi's statement is based on her evaluation of Mr. M. as opposed to Mr. M.'s self-reports. *See Tripp v. Astrue*, 489 F. App'x 951, 953, 955 (7th Cir. 2012) (finding that a doctor's statement that the claimant needed a crutch lacked "the specificity necessary to determine whether [it] was the doctor's *medical* opinion or merely a restatement of what was told to him by" the claimant) (emphasis in original). We also note that the documentation from Mr. M.'s emergency room visit less than three weeks later does not refer to a cane and, in particular, it indicates that Mr. M. walked with a steady gait (R. 679).

[16] From September 2013 through April 2017, Mr. M.'s body mass index ("BMI") exceeded 30 and, at times, exceeded 35 (*e.g.*, R. 379, 435, 458, 462, 500, 622, 663, 687). As such, he exhibited Level I or Level II obesity. SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12, 2002) ("The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9").

impairment" (R. 23). *See* SSR 02-1p, 2002 WL 34686281, at *7 (Sept. 12, 2002) ("[W]e will consider any functional limitations resulting from the [claimant's] obesity in the RFC assessment").[17] Then, in discussing her RFC assessment, the ALJ referred to Mr. M.'s obesity or body mass index ("BMI"), which indicated obesity, multiple times (R. 24, 27, 28). Finally, the ALJ's RFC assessment incorporates several limitations described in SSR 02-1p, including limitations on climbing ramps and stairs, balancing, stooping, and crouching (allowed only frequently), climbing ladders, ropes, and scaffolds (allowed only occasionally), and handling hazards ("can occasionally work at unprotected heights and occasionally work around moving mechanical parts") (R. 23-24). *See Shumaker v. Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015) (identifying "limitations on balancing, stooping, crouching, climbing ramps and stairs, and handling hazards" as "limitations described in SSR 02-1P"); SSR 02-1p, 2002 WL 34686281, at *6 (explaining that obesity may "affect [the] ability to do postural functions, such as climbing, balance, stooping, and crouching," as well as the "ability to tolerate . . . hazards").

In similar circumstances, both the Seventh Circuit and this Court has found an ALJ's discussion of obesity adequate. In *Shumaker*, the Seventh Circuit rejected the claimant's argument that the ALJ failed to adequately account for her obesity where the ALJ had concluded that obesity was a severe impairment, specifically referred to SSR 02-1p, and incorporated into the RFC "limitations on balancing, stooping, crouching, climbing ramps and stairs, and handling hazards." 632 F. App'x at 867. And in *Chandler v. Colvin*, No. 15 C 1306, 2016 WL 3030171 (N.D. Ill. May 25, 2016), we relied upon *Shumaker* to reject the claimant's argument that the ALJ failed to properly consider her obesity's effect on her impairments when determining credibility, as the ALJ

---

[17] On May 20, 2019, the SSA rescinded SSR 02-1p and replaced it with SSR 19-2p. SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019). SSR 02-1p, however, was the applicable rule in effect at the time the ALJ issued her decision in November 2017 (R. 33). *See id.* at *5 n.14.

had determined that the claimant's obesity was a severe impairment and incorporated "limitations on balancing, stooping, crouching, climbing ramps and stairs, and handling hazards." *Id.* at *11. We find no reason to come to a different result here.

Furthermore, any alleged error in the ALJ's consideration of Mr. M.'s obesity and the effect it had on his other impairments was harmless. A claimant must explain how his obesity affected his ability to work before an ALJ's failure to adequately discuss obesity will require remand. *See Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) ("[A]n ALJ's failure to explicitly consider an applicant's obesity is harmless if the applicant did not explain how her obesity hampers her ability to work") (internal quotations omitted); *Shumaker*, 632 F. App'x at 867-68 (finding any error in the ALJ's consideration of the claimant's obesity harmless because the claimant did "not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does she explain how her obesity exacerbated her underlying impairments"). Here, Mr. M. merely ticks off activities and abilities that *might* be limited by obesity (Pl.'s Summ. J. Mem. at 10-11). This is not enough: it was Mr. M.'s burden to explain how obesity *actually* affected his functioning. *Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008) (finding harmless error where the claimant "did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning—as it was her burden to do"); SSR 02-1p, 2002 WL 34686281, at *6 ("[W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment"). Mr. M.'s failure to do so renders harmless any potential error in the ALJ's consideration of his obesity.

**3.**

Mr. M.'s remaining RFC arguments fare no better. *First*, Mr. M. points to different aspects of his hearing testimony, presumably as proof that he cannot perform the activities required of him by the ALJ's RFC assessment (Pl.'s Summ. J. Mem. at 10). The ALJ, however, was under no obligation to accept this testimony as true, *Fuchs*, 873 F. Supp. 2d at 974, and we have already upheld the ALJ's decision to discount Mr. M.'s testimony about his limitations.

*Second*, Mr. M. claims that "[i]t is unclear how [he], based upon back and knee pain alone, with objective findings on MRI's [sic] and x-rays to back his allegations of pain up, would be able to sustain the lifting requirements for 'medium' work, much less the standing and walking requirements attendant to work at the medium exertional level" (Pl.'s Summ. J. Mem. at 11 (footnote omitted)). But Mr. M. ignores the fact that the non-examining state agency consultants who reviewed his medical evidence opined that he could meet the lifting, standing, and walking requirements of medium work (R. 81-82, 91-92, 106, 119 (concluding that Mr. M. can lift and/or carry 50 pounds occasionally and 25 pounds frequently and that he can stand or walk for about six hours in an eight-hour workday)). In crafting her RFC assessment, the ALJ gave "significant weight" to the opinions offered by these consultants (R. 30-31).[18] The ALJ was entitled to rely upon these medical opinions about Mr. M.'s ability to perform medium work, especially given that Mr. M. failed to provide any medical opinion saying that he could *not* perform medium work. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (finding that the ALJ was entitled to rely upon the opinions of non-examining state agency doctors to determine the claimant's RFC); *Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *7 (N.D. Ill. Oct. 29, 2014) (explaining that "[t]he

---

[18] The ALJ identified Dr. Riley as the consultant who opined at the reconsideration level that Mr. M. could do medium work with certain postural limitations (R. 30-31). In fact, it was Dr. Prosperi who gave this opinion; Dr. Riley only addressed Mr. M.'s visual abilities and limitations (R. 104-08, 117-21). This minor error does not undermine or otherwise affect the weight the ALJ gave to the non-examining consultants' opinions.

medical opinion of a state agency reviewing physician . . . can constitute substantial evidence to support an ALJ's opinion, especially where there is no other medical opinion to contradict it").

*Third*, Mr. M. asserts that the ALJ "failed to consider even the very real possibility that his multiple strong prescription pain medications would cause him to feel drowsy—a particular problem for an individual employed as a commercial driver" (Pl.'s Summ. J. Mem. at 11). Yet Mr. M. does not point to any evidence that he, in fact, became drowsy after taking his prescription pain medications. To the contrary, Mr. M. testified that he did not know whether he experienced side effects from his pain medication (R. 56-57). And that drowsiness *could* have been a side effect of Mr. M.'s pain medication is nothing more than speculation, which the ALJ need not consider. *In re Cohen*, 507 F.3d 610, 614 (7th Cir. 2007) ("[S]peculation is not evidence"); *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence").

*Fourth*, Mr. M. refers to the ALJ's purported "failure to factor in his severe hypertension, and any effects of his obesity" (Pl.'s Summ. J. Mem. at 11). We have already addressed the ALJ's consideration of Mr. M.'s obesity. Mr. M.'s undeveloped reference to his severe hypertension, without any explanation as to why the ALJ's RFC assessment does not accommodate this impairment, is not enough to raise an issue of error on appeal. *See Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018); *Imse v. Berryhill*, 752 F. App'x 358, 363 (7th Cir. 2018).

### C.

Mr. M. next argues that the ALJ erred when she rejected the function report completed by Mr. M.'s sister, Ms. A., in February 2015 (Pl.'s Summ. J. Mem. at 11; *see* R. 274-81). The ALJ gave "very little weight" to this report, which the ALJ characterized as "reiterat[ing] many of the claimant's alleged symptoms and limitations" (R. 31). The ALJ reasoned that Ms. A. "is not a

medical expert nor is she familiar with Agency programs or regulations[,] so her insight as to the claimant's treatment record and prognosis is limited" (*Id.*). The Commissioner concedes that this analysis is erroneous (Def.'s Summ. J. Mem. at 9). Thus, we must decide whether the ALJ's error was harmless. *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) (explaining that harmless errors "do not require (or indeed permit) the reviewing court to upset the agency's decision").

The Commissioner argues that the ALJ's failure to properly evaluate Ms. A.'s function report was harmless because her report "was largely cumulative and even duplicative of two other" function reports submitted by Mr. M., and Mr. M. failed to identify anything in this report "that would have changed the ALJ's consideration" (Def.'s Summ. J. Mem. at 9). We agree, and we note that Mr. M.'s reply continues to omit any explanation as to how his sister's function report would have changed the ALJ's consideration (Pl.'s Reply at 3). Merely identifying administrative error is not enough; Mr. M. must explain how the error harmed him. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). He has failed to do so.

To the extent Ms. A.'s report reiterates Mr. M.'s assertions (which Mr. M. does not dispute), we find this case similar to *Books v. Chater*, 91 F.3d 972 (7th Cir. 1996). In *Books*, the claimant argued that reversal was necessary because the ALJ did not specifically address the testimony of the claimant's brother. 91 F.3d at 980. The Seventh Circuit rejected this argument because the brother's testimony "served strictly to reiterate, and thereby corroborate, [the claimant's] own testimony concerning his activities and limitations"; therefore, to the extent the ALJ found the claimant's testimony untenable when contrasted with the other evidence, the ALJ necessarily found the brother's "supporting testimony similarly not credible." *Id.*

The same is true here. One allegation that Ms. A. corroborates is Mr. M.'s alleged use of a cane for walking (*Compare* R. 280, *with* R. 292, 328). But as already discussed, the ALJ permissibly found Mr. M.'s "reported need to use a cane . . . inconsistent with the treatment record" (R. 30). The ALJ similarly would have found Ms. A.'s cane assertion inconsistent with the treatment record. As another example, Mr. M. does not explain why the ALJ would have found Ms. A.'s assertions regarding Mr. M.'s ability to lift, stand, and walk any more credible or persuasive than Mr. M.'s own assertions, given the ALJ's decision to rely upon medical evidence—namely, the opinions of the non-examining state agency consultants—to assess these abilities.

An error is harmless "if we are convinced that the ALJ would reach the same result on remand." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). Here, we are convinced that the ALJ would have come to the same conclusion had she properly considered Ms. A.'s function report. Thus, the ALJ's failure to do so does not require remand.

## D.

Next, Mr. M. argues that the ALJ reversibly erred when she relied solely upon the opinions of the non-examining state agency consultants and failed to seek any medical opinions from Mr. M.'s treating sources (Pl.'s Summ. J. Mem. at 12). Mr. M. contends that by doing so, the ALJ found "herself in the position of playing doctor," rendered her own lay medical opinion, and ignored her "affirmative duty to recontact a medical source for clarification if the information received is inadequate for purposes of determining disability" (*Id.*).

This contention is without merit. Mr. M. cannot persuasively assert that the ALJ, by relying upon the medical opinions of non-examining state agency consultants, improperly rendered her own medical opinion. The opinion of a non-examining state agency consultant is the type of

medical evidence an ALJ may rely upon to craft a claimant's RFC. *See Rice*, 384 F.3d at 370; *Mason*, 2014 WL 5475480, at *7; *see also* 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (requiring ALJs to consider evidence from agency consultants because these consultants "are highly qualified and experts in Social Security disability evaluation").

What is more, an ALJ is generally under no "affirmative duty" to contact a claimant's physician to obtain a medical opinion. 20 C.F.R. §§ 404.1520b(b)(2)(i), 416.920b(b)(2)(i) ("We *may* recontact your medical source") (emphasis added); *see also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) ("The word 'may' clearly connotes discretion").[19] In fact, the Seventh Circuit found an argument similar to Mr. M.'s "frivolous" and noted that the previous version of Section 404.1520b, which also stated that the ALJ "may" recontact a medical source, did not require the ALJ "to contact a medical source under any circumstance." *Palmer v. Saul*, 779 F. App'x 394, 398 (7th Cir. 2019). The regulatory subsection Mr. M. attempts to invoke does not say otherwise, as it similarly explains that an ALJ "may" request or order a consultative examination. 20 C.F.R. § 404.1512(b)(2).[20]

"The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *see also Primm v. Saul*, --- F. App'x ----, 2019 WL 6220541, at *3 (7th Cir. Nov. 21, 2019) (rejecting the claimant's attempt to fault the ALJ for not obtaining treatment notes from his treating physician). It was Mr. M.'s obligation to provide the ALJ with any medical opinions from his

---

[19] We are aware of one exception: an ALJ must recontact medical sources "when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Mr. M., however, does not cite *Skarbek* or otherwise explain why the evidence in the record was insufficient to determine the question of disability.

[20] Mr. M. cites 20 C.F.R. § 404.1512(e) (Pl.'s Summ. J. Mem. at 12), but subsection (e) no longer existed when the ALJ rendered her decision in November 2017 (R. 33). The substance of the language from former subsection (e) is now found in subsection (b)(2) of the current version of § 404.1512. *Compare* 20 C.F.R. § 404.1512 (Mar. 27, 2017), *with* 20 C.F.R. § 404.1512 (Apr. 20, 2015 to Mar. 26, 2017).

treating physicians that are relevant to his disability claim. Mr. M. cannot blame the ALJ for his own failure to do so.

## E.

Mr. M. further contends that the ALJ improperly relied on the fact that Mr. M. occasionally earned above the level of substantial gainful activity during the relevant period to find that he could return to his past work as a truck driver at Step Four (Pl.'s Summ. J. Mem. at 12). The ALJ's discussion of substantial gainful activity levels at Step Four, however, was in the context of determining whether Mr. M.'s work as a truck driver in 2007, 2008, 2009, 2011, 2012, and 2016 constituted "past relevant work" (R. 31). This is precisely what the ALJ was supposed to do, as "past relevant work" only includes work "that was substantial gainful activity." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). Then, the ALJ compared Mr. M.'s RFC with the physical and mental demands of his past relevant work to determine whether he was disabled (R. 31-32). Again, this is what the ALJ was supposed to do. 20 C.F.R. §§ 404.1560(b), 416.960(b) ("We will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work. . . . If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled"). This argument does not warrant remand.

## F.

Finally, we turn to Mr. M.'s last argument, which faults the ALJ for relying upon the VE's testimony to find that Mr. M. is not disabled. Mr. M. appears to contend that (1) the VE erred in finding that Mr. M. performed his past relevant work at the medium exertional level, and the ALJ improperly assessed Mr. M.'s RFC based on this erroneous testimony; and (2) the ALJ erred in

accepting the VE's testimony that Mr. M. could work as a "machine feeder" when Mr. M.'s RFC limits his ability to work around moving mechanical parts (Pl.'s Summ. J. Mem. at 13).

Mr. M.'s first contention is meritless. Notably, he does not identify any portion of the ALJ's decision suggesting that she based her RFC assessment on the VE's testimony about Mr. M.'s past relevant work. To the contrary, the ALJ supported her RFC assessment by discussing the medical and subjective evidence in the record (R. 24-31), which included opinions from two non-examining state agency consultants who found that Mr. M. could perform medium work with some postural limitations (R. 30-31). As for the VE's purported error in finding that Mr. M. performed his past work at the medium exertional level, Mr. M.'s attorney at the hearing (who is also the same attorney now making this argument) told the ALJ that Mr. M.'s past work "seems to be at least probably medium" (R. 43). Nevertheless, it does not matter if the VE erroneously categorized the exertional level of Mr. M.'s past relevant work as *he actually* performed it, because Mr. M. does not challenge the VE's categorization of his past relevant work's exertional level as *generally* performed (*see* Pl.'s Summ. J. Mem. at 13 ("[T]he vocational expert may well have been correct about the actual exertional classification of Plaintiff's past work")). The ability to work a past job as it is generally performed is all that is needed to satisfy Step Four. *See Hernandez*, 277 F. App'x at 624-25 ("At step four an ALJ may find a claimant not disabled if she can perform her past work either as it is generally performed in the national economy or as she actually performed it"); *Orlando v. Heckler*, 776 F.2d 209, 215 (7th Cir. 1985) ("[T]he administrative law judge was allowed to base his comparison on the functional demands and job duties of the occupation as generally required by employers throughout the national economy"); SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("[I]f the claimant . . . can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not

disabled'"). And, in fact, the VE testified that an individual with Mr. M.'s RFC could perform his past truck driver jobs as they are "typically performed" (R. 66-67).

Mr. M.'s second contention, which concerns the ALJ's Step Five analysis, likewise fails to show reversible error. Even if the VE erred by finding that someone who can only occasionally work around moving mechanical parts could work as a machine feeder, the error is harmless because Mr. M. does not challenge the two other occupations identified by the VE—packager and order picker (R. 32, 67-68). *See Nicholson v. Astrue*, 341 F. App'x 248, 254 (7th Cir. 2009) (explaining that any error with respect to two jobs identified by the VE was harmless because the claimant did not dispute that other jobs fitting his RFC remained available). These positions account for 40,000 jobs nationally (R. 67-68) and are therefore enough to support the ALJ's alternative Step Five finding. *See Primm*, 2019 WL 6220541, at *5; *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) ("1,000 jobs is a significant number"). What is more, because Mr. M. has not shown that the ALJ erred in finding him disabled at Step Four, any error allegedly committed by the ALJ in performing her alternative Step Five analysis (R. 32) necessarily would be harmless. *See Knight v. Chater*, 55 F.3d 309, 316 n.2 (7th Cir. 1995) (declining to consider the ALJ's Step Five analysis where the ALJ's Step Four decision was upheld); *Reynolds v. Colvin*, No. 1:14-cv-00441-SEB-DML, 2015 WL 5032309, at *4 (S.D. Ind. Aug. 24, 2015) ("Step [F]ive is germane only if, at [S]tep [F]our, there is a determination that the claimant cannot perform her past relevant work").

## CONCLUSION

For the foregoing reasons, we deny plaintiff Joseph M.'s motion for summary judgment (doc. # 17) and grant defendant Commissioner's cross motion for summary judgment (doc. # 28). We affirm the Commissioner's decision. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: December 19, 2019**